IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

KING BRADLEY, JR. and
CHRISTIE BRADLEY,

      Plaintiffs,

v.                              No. 12-1196

AMERISTEP, INC. and
PRIMAL VANTAGE CO., INC.,

      Defendants.

_____

ORDER GRANTING DEFENDANTS' MOTIONS TO EXCLUDE EXPERT TESTIMONY,
DENYING DEFENDANTS' MOTION TO FILE SURREPLY,
GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT,
DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT,
AND DENYING THE PLAINTIFFS' MOTION FOR SANCTIONS

_____

*INTRODUCTION*

      The Plaintiffs, King Bradley, Jr. and Christie Bradley, initially brought this action against

the Defendants, Ameristep, Inc. ("Ameristep") and Primal Vantage Co., Inc. ("Primal Vantage"),

in the Circuit Court of Madison County, Tennessee in August 2012. The matter was removed to this

Court on August 30, 2012 on diversity grounds. Before the Court are the Defendants' motions for

summary judgment (D.E. 57-59)[1]; to preclude or limit the trial testimony of Plaintiffs' experts,

_____

      [1]The Defendants filed three separate motions for summary judgment in which they
addressed different elements of the same claims. It is unclear to the Court why counsel opted for
what seems an awkward and repetitive briefing practice, other than perhaps to avoid the page
limitation set by the Local Rules of this district. Defendants' attorneys are advised that, in the
future, the Court prefers that requests for summary judgment be sought in the same motion and
that an appropriate motion be filed in the event counsel deems it necessary to exceed the Local
Rules' page limitation. In any case, in order to avoid confusion and for the sake of judicial
economy, the motions will be ruled on as if all of Defendants' assertions in support of summary
judgment had been contained in one motion.

Charles Powell and Alan Davison (D.E. 64-65); and to file a surreply (D.E. 84.). Also pending before the Court are Plaintiffs' motions for partial summary judgment (D.E. 55) and for sanctions (D.E. 86).

*STANDARD OF REVIEW*

The pending motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure, which provides in pertinent part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To survive summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 759-60 (6th Cir. 2010) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (internal quotation marks omitted). "A genuine issue of material fact exists if a reasonable juror could return a verdict for the nonmoving party." *Id.* at 759 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact is 'material' if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Transp. Co., Inc.*, 446 F.3d 637, 640 (6th Cir. 2006). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 748 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 255). "Entry of summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)) (internal quotation marks omitted).

*FACTS*

In the autumn of 2009, Mr. Bradley purchased a pair of replacement ratchet straps for a hunting tree stand at a Wal-Mart store in Jackson, Tennessee. Defendant Primal Vantage designed and manufactured the straps, which Ameristep distributed. The straps were used once in 2009 by Bradley to secure a tree stand to a tree for approximately one month. Thereafter, according to the Plaintiff, the stand and the straps were taken down and stored in his garage. In May 2011, he secured the stand in a tree using the straps and left it in that position until September 29, 2011, when he returned to the tree stand to bow hunt. After climbing the tree and sitting down on the stand, he leaned back to retrieve his cell phone from his pocket. The straps broke, causing him and the tree stand to fall more than twenty-five feet to the ground.

The products at issue are two six-foot, one-inch camo ratchet straps used to replace ratchet straps on tree stands. The user places the end hooks on one side of the tree stand, wraps the ratchet strap around the back of the tree and secures the other hook end of the ratchet strap to the tree stand. He then uses the ratchet mechanism to secure the strap to the tree. One of the two ratchet straps was a 2006 model ASRS 900 one-inch, six-foot polypropylene ratchet strap and the other was a 2007 model. Bradley used these straps to secure his Gorilla tree stand.

The written instructions provided with the straps contained the following:

**You MUST READ all Warnings and Restrictions before use**
Follow your manufacturer's tree stand installation and set-up instructions
for proper installation of ratchet strap

**DO NOT** leave Ratchet Strap out in sunlight or other weather when not in use

\*       \*       \*

1.      **ALWAYS** read all warnings and instructions before each use of product. Failure to read all warnings and instructions before each use of product may result

in serious injury or death.

> 2.      Remove all contents from clamshell.  Inspect for any damaged or missing pieces.  **DO NOT** assemble to ladder stand if any parts are missing or damaged.  Using the ratchet with missing or damaged parts may result in serious injury or death.  Missing or damaged parts may be obtained from the address and phone number listed below.

*      *      *

> 5.      **DO NOT** leave the ratchet outside all year round.  It must be stored inside when not in use.

*      *      *

> 10.      This Ratchet Strap is for replacement of ratchet straps included with your tree stand **ONLY.**

*      *      *

> 13.      **DO NOT** leave ratchet strap out in sunlight or other weather when not in use.

(D.E. 68-5.)  Bradley read the warnings and instructions packaged with the straps and then discarded them.  On the day of the accident, he utilized a number of different products with the straps, including the tree stand, a StrongBuilt climbing stick ladder and a Rivers Edge climbing stick.

*CONTENTIONS OF THE PARTIES AND ANALYSIS*

The Plaintiffs are pursuing damages from the Defendants under the theories of strict product liability, strict liability for failure to warn, negligent failure to warn, and negligent design and manufacture under Tennessee state law.  They also claim the Defendants violated the Tennessee Consumer Protection Act, Tennessee Code Annotated § 47-18-101, *et seq.*  In addition, Plaintiff Christie Bradley seeks redress for loss of consortium.

Product liability suits in Tennessee are governed by the Tennessee Products Liability Act,

Tennessee Code Annotated § 29-28-101, *et seq.* ("TPLA").[2] Tenn. Code Ann. § 29-28-102(6) (providing that suits under the statute include actions based upon, among other things, strict liability in tort, negligence and failure to warn); *Strayhorn v. Wyeth Pharm, Inc.*, 737 F.3d 378, 392 (6th Cir. 2013), *reh'g & reh'g en banc denied* (Jan. 23, 2014); *see also Johnson v. Electrolux Home Prods, Inc.*, No. 2:09-CV-142, 2011 WL 4397494, at *4 (E.D. Tenn. Aug. 31, 2011) ("The [TPLA] was written to provide the exclusive remedy for injuries caused by products"), *report & recommendation adopted by* 2011 WL 4433114 (E.D. Tenn. Sept. 20, 2011). An action may be maintained under the statute against "a manufacturer or seller of a product for injury to person or property caused by its defective or unreasonably dangerous condition . . ." Tenn. Code Ann. § 29-28-103(a). Because the statute is interpreted in the disjunctive, a plaintiff may establish either that the product was defective or unreasonably dangerous. *Fulton v. Pfizer Hosp. Prods. Group, Inc.*, 872 S.W.2d 908, 911 n.1 (Tenn. Ct. App. 1993). The Plaintiffs have alleged that the straps were both defective and unreasonably dangerous.

"A manufacturer or seller of a product shall not be liable for any injury to a person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller." Tenn. Code Ann. § 29-28-105(a).

> In making this determination, the state of scientific and technological knowledge available to the manufacturer or seller at the time the product was placed on the market, rather than at the time of injury, is applicable. Consideration is given also to the customary designs, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products.

---

[2].In this diversity action, the district court is to apply the substantive law of the state where the lawsuit was filed, Tennessee. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013).

Tenn. Code Ann. § 29-28-105(b).

"Defective condition" is defined under the TPLA as "a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." Tenn. Code Ann. § 29-28-102(2). "A defect in a product may be proven by direct evidence, circumstantial evidence, or a combination of both." *Whaley v. Rheem Mfg. Co.*, 900 S.W.2d 296, 299 (Tenn. Ct. App. 1995); *see also Johnson v. Wal-Mart Stores E., LP*, No. 3:11-CV-469, 2013 WL 3168591, at *4 (E.D. Tenn. June 20, 2013). "[T]he failure or malfunction of the device, without more, will not make the defendant liable. A plaintiff must show that there was something wrong with the product, and trace the plaintiff's injury to the specific defect." *King v. Danek Med., Inc.*, 37 S.W.3d 429, 435 (Tenn. Ct. App. 2000) (internal citations omitted). Moreover, the "fact that a plaintiff is injured is not proof of a defect in the product." *Id.* Nor is it sufficient to "show that the product caused the plaintiff's injury or was involved in it." *Shoemake v. Omniquip Int'l, Inc.*, 152 S.W.3d 567, 573 (Tenn. Ct. App. 2003).

> A manufacturer is not an insurer of the product he designs, and it is not required that the design adopted be perfect, or render the product accident proof, or incapable of causing injury, nor is it necessary to incorporate the ultimate safety features in the product. Hence, a departure from the required standard of care is not demonstrated where it is simply shown that there was a better, safer or different design which would have averted the injury.

*Godwin v. Electrolux Home Prods., Inc.*, No. 2:09-0106, 2011 WL 1357691, at *4 (M.D. Tenn. Apr. 11, 2011) (quoting *Kerley v. Stanley Works*, 553 S.W.2d 80, 84 (Tenn. Ct. App. 1977)). The plaintiff bears the burden of identifying a defect in the product. *Langford v. Gatlinburg Real Estate & Rental, Inc.*, 499 F. Supp. 2d 1042, 1051 (E.D. Tenn. 2007).

"Unreasonably dangerous" means that

> a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous

condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition.

Tenn. Code Ann. § 29-28-102(8).

The statute provides two tests to determine whether a product is unreasonably dangerous -- the consumer-expectation test and the prudent-manufacturer test. *Strayhorn*, 737 F.3d at 392. Under the first, "a product is not unreasonably dangerous if the ordinary consumer would appreciate the condition of the product and the risk of injury." *Griffin v. Navistar Inc.*, No. 2:08-cv-02283-JPM-tmp, 2010 WL 2734043, at *3 (W.D. Tenn. July 8, 2010). The prudent-manufacturer test "requires proof about the reasonableness of the manufacturer or seller's decision to market a product assuming knowledge of its dangerous condition." *Strayhorn*, 737 F.3d at 392 (quoting *Ray by Holman v. BIC Corp.*, 925 S.W.2d 527, 531 (Tenn. 1996)). While the two tests are not mutually exclusive, "the prudent[-]manufacturer test will often be the only appropriate means for establishing the unreasonable dangerousness of a complex product about which an ordinary consumer has no reasonable expectation." *Id.* (quoting *Ray by Holman*, 925 S.W.2d at 531). A plaintiff "must offer expert testimony about the prudence of the decision to market when the prudent-manufacturer test applies." *Brown v. Raymond Corp.*, 432 F.3d 640, 644 (6th Cir. 2005) (internal quotation marks omitted).

"[I]n order to recover under the TPLA, a plaintiff must [also] show that the product manufactured and sold by the defendant caused the injuries he alleges to have sustained." *Strayhorn*, 737 F.3d at 404 (quoting *Richardson v. GlaxoSmithKline*, 412 F. Supp. 2d 863, 868 (W.D. Tenn. 2006)) (internal alterations omitted). The issue of proximate cause is generally one for the jury to determine "unless the facts and the inferences to be drawn therefrom are beyond all reasonable dispute." *Frausto v. Cooper Tire & Rubber Co.*, No. 3-12-0761, 2014 WL 581724, at

*2 (M.D. Tenn. Feb. 13, 2014).

Before applying the law to the positions of the parties, the Court must first address the Defendants' motions to exclude the testimony of Powell and Davison. The Defendants argue that the proffered experts are not qualified to provide expert testimony and that their testimony does not pass muster under United States Supreme Court precedent. In determining whether a witness is qualified as an expert, the district court must apply Rule 702 of the Federal Rules of Evidence, which provides that

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

*United States v. Freeman*, 730 F.3d 590, 600 (6th Cir. 2013); Fed. R. Evid. 702. Thus, a "proffering party can qualify their expert with reference to his knowledge, skill, experience, training or education." *United States v. Cunningham*, 679 F.3d 355, 378 (6th Cir. 2012) (internal quotation marks omitted), *cert. denied*, 133 S. Ct. 1584 (2013). "Whether a proposed expert's experience is sufficient to qualify the expert to offer an opinion on a particular subject depends on the nature and extent of that experience." *United States v. Beasley*, ___ F. App'x ___, 2014 WL 840823, at *5 (6th Cir. Mar. 5, 2014). The requirement that an expert be qualified is to be treated liberally. *Id.* That said, a witness is not an expert merely because he claims to be one. *Rose v. Truck Ctrs., Inc.*, 388 F. App'x 528, 533 (6th Cir. 2010). "The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Id.* (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351

(6th Cir. 1994)).

"Qualifying an expert by knowledge, skill, experience, training, or education is only the first hurdle to clear under Rule 702." *Cunningham*, 679 F.3d at 379 (internal quotation marks omitted). To be admissible, the proposed testimony must also be "(1) relevant, meaning that the testimony will help the trier of fact to understand the evidence or to determine a fact in issue, and (2) reliable." *Id.* at 379-80 (internal quotation marks omitted). The proponent of expert testimony bears the burden of showing admissibility. *E.E.O.C. v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, at *3 (6th Cir. 2014).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the seminal case applying Rule 702, the United States Supreme Court recognized that implicit in the Rule is the district court's gatekeeping role in "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The district courts "have broad latitude in deciding whether to admit expert testimony under *Daubert*[.]" *United States v. Stafford*, 721 F.3d 380, 393 (6th Cir.), *cert. denied*, 134 S. Ct. 463 (2013).

When asked in his deposition about his expertise in evaluating polymer materials, Powell testified that "Well, I'm a materials -- I do materials failure analysis. I look at all types of polymer materials from composite materials to polyethylene bottles that fail." (D.E. 68-25 at 25.) According to his expert report, he is a registered professional engineer and holds a Level III certification in nondestructive testing (general methods, magnetic inspection, ultrasonic inspection and penetrant inspection). He is chief executive officer of a consulting engineering company specializing in materials failure analysis, accident investigation and materials evaluation. From 1987 to 1995, he worked for the Federal Aviation Administration as an instructor in nondestructive testing,

identification of material discontinuities and certification of FAA repair stations and nondestructive evaluation inspectors. From 1978 to 1989, Powell was project director and then corporate president and chief executive officer of a materials testing and evaluation laboratory with capabilities in physical materials testing, light and electron microscopy, nondestructive testing and failure analysis. He was also employed as a community college adjunct professor of metallurgy, welding and joining, and as a metallurgist for the United States Air Force. The proposed expert holds a bachelor of science degree in metallurgical engineering from the University of Oklahoma, worked toward a master's degree in the same specialty, and took a short course in fracture mechanics. Powell has written articles and lectured on stainless steels, metallurgical analysis of drill pipe and platforms, jet engine turbine blades, accident investigation, use of scanning electron microscopes, metallurgical evidence in tractor/trailer accidents, tank construction and plastic carbon replication techniques for transmission electron microscopy. In his report, he listed his current professional activities as accident investigation (in automobile and aircraft cases) and engineering failure analysis of products and structures; product evaluation, materials selection, and design improvement as applied to industrial processes and consumer products; physical metallurgical aspects of material failures; development of forensic scanning electron microscopy and x-ray elemental analysis for the characterization of material fractures, surface deposits and microscopic fragment analysis; and application of advanced nondestructive evaluation techniques for product in-service reliability, structural integrity and component design.

According to their response to the motion to exclude his testimony, Plaintiffs seek to offer Powell's expert testimony that the Defendants failed to include an ultraviolet (UV) inhibitor in the

ratchet straps[3] that would have prevented the degradation of the polymers when exposed to sunlight during the period of time Mr. Bradley claimed he left the straps on the tree stand. He is also to present testimony that the Defendants failed to instruct consumers to recognize when the straps were no longer safe for use with a tree stand.

Powell was recently proffered as an expert in a nearly identical lawsuit in the Eastern District of Oklahoma involving the same product and the same defendants.[4] In *Freeland v. Ameristep, Inc.*, No. 13-cv-08-JHP, 2014 WL 1646948 (E.D. Okla. Apr. 24, 2014),[5] the plaintiff purchased two 2008 model ratchet straps[6] and was injured in a fall from a tree stand when one of the straps broke. *Freeland*, 2014 WL 1646948, at *1. Freeland's counsel, as in this case, obtained an expert opinion from Powell that the ratchet straps were defective because they lacked a UV additive, which caused the plaintiff's injury. *Id.* at 4. The district court found as follows:

> At the outset, the [c]ourt finds that Mr. Powell['s] expertise with regard to design of ratchet straps manufactured using polymer polypropylene webbing insufficient to qualify him as an expert on the design and manufacture of the 2008 Ratchet Straps. Although Mr. Powell is an accomplished engineer, his expertise appears to be strongly concentrated in the area of metallurgy. Significantly, Mr. Powell has very limited experience with UV inhibitors to polymer materials -- the very materials that are the subject of this case. As such, the [c]ourt finds that Mr. Powell's general engineering knowledge is insufficient to qualify him as an expert with regard to the

---

[3]It appears at this point in the litigation that Defendants do not dispute the fact that the straps did not include a UV inhibitor.

[4]The Oklahoma case also involved the same counsel.

[5]On April 28, 2014, the Defendants moved for permission to file additional briefs in this case in light of *Freeland*. (D.E. 84.) In reviewing the motion, however, it appears the Defendants seek merely to make the Court aware of and to compare this case to the *Freeland* decision. As the opinion is available on Westlaw for the Court's perusal, the relief requested by the Defendants seems unnecessary and is, therefore, DENIED.

[6]The Primal Vantage ratchet strap before the court in *Freeland* was a slightly newer model than those at issue here.

2008 Ratchet Straps at issue in this case.  Therefore, the [c]ourt finds that Mr. Powell is not qualified to opine as to the design and manufacture of the 2008 Ratchet Straps.

*Id.* at *3 (internal citations omitted).

This Court agrees with the *Freeland* court's assessment.  It is part of the district court's gatekeeping function to ensure "that the actual testimony does not exceed the scope of the expert's expertise, which if not done can render testimony unreliable under Rule 702." *In re Meridia Prods. Liab. Litig.*, 328 F. Supp. 2d 791, 804 (N.D. Ohio 2004), *aff'd sub nom. Meridia Prods Liab. Litig. v. Abbott Labs.*, 447 F.3d 861 (6th Cir. 2006).  Just because Powell is an engineer does not mean he is an expert in polymers.  As noted by the district judge in *Freeland*, his expertise is clearly in metallurgy and his experience with the webbing material at issue in these two cases is, according to the evidence presented, sparse.  Thus, the Court finds that Plaintiffs have failed to bear their burden of showing that Powell is qualified to render expert testimony as to the defective design and/or manufacture of the ratchet straps used by Mr. Bradley.  *See Cunningham v. Masterwear, Inc.*, No. 1:04-cv-1616-JDT-WTL, 2007 WL 1164832, at *10 (S.D. Ind. Apr. 19, 2007) (fact that proffered experts were medical doctors did "not automatically give them the right to opine on all medically-related subjects in a court of law"); *In re Meridia Prods. Liab. Litig.*, 328 F. Supp. 2d at 804-05 (plaintiff failed to carry burden of showing proffered expert, a pharmacologist, was qualified to testify on adverse cardiovascular events and obesity even though he had performed research in cardiovascular pharmacology; served as research director at cardiovascular research center; was fellow for American College of Cardiology, American Heart Association and International Heart Failure Society; attended symposia on weight loss; lectured regarding obesity and worked with a team that made decisions regarding whether to prescribe weight loss medication); *Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 24 (D. Mass. 1995) ("Just as a lawyer is not by general education and

experience qualified to give an expert opinion on every subject of the law, so too a scientist or medical doctor is not presumed to have expert knowledge about every conceivable scientific principle or disease.").

Davison's analysis, according to his report, dealt with human factors engineering and safety. Plaintiffs explained in their response to the motion to exclude his testimony that Davison analyzed "events leading to the injuries suffered by Plaintiff, specifically, making an analysis on the human factors engineering and safety aspects and factors preceding the event with special attention focused on the warnings and instructions." (D.E. 69 at 7.) In his report, Davison opined that "[t]he Ameristep replacement ratchet straps purchased by Mr. King Bradley were defective at the time of purchase because of failure to warn of the risk of falling due to the straps breaking as a result of decay of the polypropylene material" and "[t]he nearly complete disregard for a safety program that should have ensured the development of safety into these ratchet straps directly caused the fall and resulting injury to Mr. King Bradley." (*Id.* at 5.) He concluded that

> [t]he failure of this ratchet strap was the result of a latent hazard. Mr. Bradley was not able to determine by inspection when the strap was no longer safe for use. The failure of Ameristep to design the product for the foreseeable use and further failure to mitigate the risk of falling due to strap weathering by either design or warning directly contributed to the fall and injuries to Mr. Bradley.

(*Id.* at 13.)

As with Powell, the Defendants submit that Davison is not qualified to provide expert testimony in this case. According to the Plaintiffs' brief, Davison obtained a bachelor of science degree in mining engineering in 1977, a master's degree in safety in 1985, and a Ph.D. in industrial engineering in 1994. His employment included ensuring equipment procured by United States Army branches received proper human factor engineering and safety design considerations and teaching

college courses in human factors and ergonomics systems. Davison is a member of the American Society of Safety Engineers and the Human Factors Engineering Society.

In his deposition, Davison stated that, while he was a human factors expert, he had no expertise in materials science, polymers, webbing or solid mechanics and had never offered an opinion in another case involving webbing or polymer materials. At one point in his deposition, Defendants' counsel stated: "So I would say you're not qualified to testify . . . . [Y]ou're not a materials expert, you're just saying you looked up some other alternatives [to the polymer webbing used in the ratchet straps] and thought those might be better?," to which Davison replied, "Yes, sir." (D.E. 64-2 at 31.) The proposed expert further clarified that he would provide at trial opinions concerning any deterioration of the webbing material only with respect to the ability of a human to conduct an inspection thereof.

To the extent the Plaintiffs intend to utilize Davison to support their claim of defective design and manufacture of the ratchet straps, he is, based upon the information provided to the Court, even less qualified to do so than Powell. There is no evidence that he possesses any expertise whatever in the use of polymers or the design of the products at issue. The Defendants' motion to exclude testimony by Davison concerning the design and/or manufacture of the ratchet straps is well-taken.

The Bradleys have identified the cause of the fall as deterioration of the straps due to Primal Vantage's failure to include additives in their manufacture. Absent the testimony of their experts, herein disqualified, there is simply no evidence to support their claim. As there is no evidence beyond bald assertion that would permit a reasonable factfinder to conclude that it was more probable than not that Mr. Bradley's injury was caused by a failure to include additives in the straps, summary judgment on the design and/or manufacturing defect claim is warranted. *See Pride v. BIC*

14

*Corp.*, 218 F.3d 566, 580-81 (6th Cir. 2000) ("without admissible expert testimony on causation and product defect, no reasonable jury could find for [plaintiff] because, under Tennessee law, expert testimony is required to establish liability in cases alleging manufacturing and design defects"); *Johnson v. Volvo Truck Corp.*, No. 2:07-CV-277, 2010 WL 55317, at *2 (E.D. Tenn. Jan. 4, 2010) (same).

The Court's attention now turns to the failure to warn claims. In Tennessee, inadequate warnings may make a product defective or unreasonably dangerous. *Payne v. Novartis Pharm. Corp.*, 967 F. Supp. 2d 1223, 1229 (E.D. Tenn. 2013). To establish product liability on a failure to warn theory, the plaintiff must demonstrate that "(1) the warnings at issue were defective; (2) the defective warning made the product unreasonably dangerous; and (3) the inadequate labeling proximately caused the claimed injury." *Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 596 F. Supp. 2d 1101, 1127 (M.D. Tenn. 2009) (citing *Barnes v. Kerr Corp.*, 418 F.3d 583, 590 (6th Cir. 2005)), *aff'd on other grounds* 432 F. App'x 435 (6th Cir. 2011), *cert. denied*, 132 S. Ct. 1135 (2012). Courts considering the adequacy of manufacturers' warnings take into account "(1) whether the warning adequately indicates the scope of the danger; (2) whether it communicates the seriousness of the harm that could result from misuse; (3) whether the physical aspects of the warning alert a reasonably prudent person to the danger; and (4) the means used to convey the warning." *Id.* (citing *Barnes*, 418 F.3d at 590). This standard has been described as "fairly stiff." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991); *Payne*, 967 F. Supp. 2d at 1229. However, "[a] product is not unreasonably dangerous because of a failure to adequately warn of a danger or hazard that is apparent to the ordinary user." Tenn. Code Ann. § 29-28-105(d).

"[E]ven if an inadequate warning is found to render a product defective or unreasonably

dangerous, a plaintiff must still establish proximate causation between the failure to warn and [his] injury." *Payne*, 967 F. Supp. 2d at 1230. "Generally, a manufacturer will be absolved of liability for failure to warn for lack of causation where the consumer was already aware of the danger, because the failure to warn cannot be the proximate cause of the user's injury if the user had actual knowledge of the hazards in question." *Harden v. Danek Med., Inc.*, 985 S.W.2d 449, 451 (Tenn. Ct. App. 1998) (internal quotation marks omitted). The rationale for this rule, as explained by a federal court sitting in the Eastern District of Tennessee, "is that proximate cause cannot exist when the product's user knows of the hazard." *Arch Trims, Inc. v. W.W. Grainger, Inc.*, 872 F. Supp. 473, 475 (E.D. Tenn. 1994); *see also Curtis Through Curtis v. Universal Match Corp., Inc.*, 778 F. Supp. 1421, 1425-27 (E.D. Tenn. 1991) (claim of inadequate warning not proximate cause of injury to child whose toddler sibling used a lighter to set his diaper afire where parents were already aware young children should not play with lighters). "The user must act in accordance with his knowledge. If he does not, he, not the product's manufacturer or supplier, suffers the consequences. In such a case, any failure to warn cannot be the procuring cause of any resulting mishap." *Arch Trims, Inc.*, 872 F. Supp. at 475.

The Plaintiffs maintain that the warnings failed to sufficiently apprise the user of the dangers of leaving the products exposed to the elements and of the risk of injury associated with failure to properly store the straps. They suggest that it would not be apparent to hunters, the ordinary users of the products, that the straps could break while holding a tree stand to a tree. It is clear from the record, however, that Mr. Bradley was well aware of the dangers of using ratchet straps on a tree stand. He stated in his deposition that he knew exposing the straps to the elements would cause deterioration and breakage. If he happened to be on the tree stand when the straps broke, he knew

he would fall.  He testified that he is the type of person who reads instructions when he purchases

an item and then throws the warning materials in the trash.  Over the years, he stated that he had

purchased thirty or forty ratchet straps.  He does not dispute that he understood the importance of

inspecting the ratchet straps before each use.  In addition, Mr. Bradley offered the following

testimony:

> A:  I've purchased these ratchet straps for the past fifteen -- twenty years.  I have a system I use when I purchase them.
>
> Q:  What's your system?
>
> A:  My system is to purchase them.  I use them to hang my stands.  I use them until I see signs of wear and tear.  I inspect them every year and then I use those particular straps for just strapping stuff down or hauling off or whatever.  So I kind of recycle their use when they're not safe enough for me to hang them from elevated positions.  I discard them or use them for other things that's -- you know, other reasons.
>
> Q:  So what are you looking at when you're looking at a strap if you're saying, Gee, this looks like it's not safe to use any more?  What physically are you looking at?
>
> A:  I am looking at the stitching that wraps around those, what are they, J-hooks or S-hooks, I believe they call them.  Is that correct.
>
> Q:  You can call them S-hook, whatever.
>
> A:  J-hook.  Would you like me to show you on one of those straps?
>
> Q:  Yes, why don't you grab one and show me.
>
> A:  I inspect these stitchings right here (indicating).  That strap is wrapped through that hook and stitched.  If that stitch is wore, it's a possibility that it's going to tear and rip out from that hook.  There's also a weld right here on this hook, it appears to be spot weld.  Can you see that?
>
> Q:  Yes.
>
> A:  Where that hook is stitched.  I inspect that.  It also has a stitching on the other end. . . .  Also have a stitching on the other end where these straps loop

through the hook and are stitched together. I inspect those stitches on either end. Then last but not least, the components of the ratchet. These springs, any rust starts showing up in these components of the ratchet strap itself, I do not use to hang myself from a tree with, they are disregarded. When that starts rusting inside there, that gets weak and there's a chance that that could fail. So as long as my ratchet is in good shape and taken care of, shows no sign of aging, weathering, rust, things of that nature, my welds on the hooks are intact with no rust, and my stitchings are fine on those straps, I feel safe to hang from elevated positions in a strap like this after fifteen years, sixteen years of use. And I also look at the straps for nicks and cuts. Any cut in that strap will cause a weak point in that strap. Would you agree?

Q:     Those are the four areas of things you look at?

A:     Yes.

Q:     That's your procedure when you're inspecting straps that you use over fifteen years?

A:     Yes. Well, no, these straps do not last fifteen years.

Q:     No, I mean your usage over --

A:     Over fifteen years of hunting with this type of method, that's what I do.

Q:     And these straps do wear out over time?

A:     Yes.

Q:     And that's why you need to inspect them?

A:     Yes. And replace them.

Q:     They don't last forever?

A:     They don't last forever.

Q:     Do you look at anything else when you're inspecting these that you haven't mentioned?

A.     Those are the four basic components and makeup of the strap. So that's basically it. If there's not any nicks and tears in the strap, all the components of the ratchet look good, the welds on the hook, the stitchings, if they're in good shape, they appear to be in good shape to me, so.

Q:      Do you look at the type of thing such as discoloration, fading of the material, thinning of the material; is this something you look at, too?

A:      I would say aging of the material, yes.

Q:      Particularly webbing material, when it ages, it changes color and fades, doesn't it?  It doesn't have the brilliant or the sharp colors it has.  Does it fade over time?

A:      Yes, if the sun shines on it, I would say a fading.

Q:      Is it something that would signify to you, at least, that, gee, these straps are getting to the point where maybe I don't want to use them if it gets too faded? Is that something that would alert you to say, gee, maybe --

A:      I have -- I don't know that I would say that fading.  If a strap can fade in a day or two, you know, if you left it out in the sun.  If it was brand new and come out of a packet, and it was laid in the sun, it could fade in a day or two. Now in a day or two would that strap be ready to be replaced?  Is it no good. I wouldn't think so.

(D.E. 68-4 at 16-17.)

Mr. Bradley recalled inspecting the straps on the day of the fall and could detect no problems.  When asked if they appeared to be faded, he responded, "They didn't appear to be faded to me because I didn't have anything to compare them to.  You know, they looked normal." (*Id.* at 38.)  The Plaintiffs assert, based on the opinions of Powell and Davison,[7] that the warnings did not adequately describe how the straps should be inspected and that they should have included an expiration date.  However, they offered nothing to indicate what the expiration date should have been or how the warnings could have described every type of damage, whether from sunlight, water, freezing, temperature fluctuations or animal contact, and exactly how the straps would look after each type of damage at the point at which they were no longer safe to use.  *See Brown v. Raymond*,

_____

[7]Although the Defendants have sought exclusion of the opinions of these experts on the failure to warn claim as well as that based on design defect/manufacture, the Court need not analyze the issue as doing so would not change the outcome.

318 F. Supp. 2d 591, 600 (W.D. Tenn. 2004) (expert's failure to propose alternative warnings rendered testimony irrelevant to the trier of fact).

Plaintiffs also argue that the Defendants failed to warn users to wear a safety harness. However, in his deposition, Mr. Bradley acknowledged that use of a harness was recommended for hunters in tree stands. He did not use one because he feared falling from the stand and being left suspended in the harness until someone came searching for him. He admitted that he consciously chose to not wear a harness and even went so far as to not require his sons to do so when they hunted with him. There is no evidence whatever that a warning advising the use of a safety harness would have changed his behavior. *See In re Aredia & Zometa Prods. Liab. Litig.*, No. 3:06-md-1760, 2009 WL 2496932, at *2 (M.D. Tenn. Aug. 13, 2009) (summary judgment appropriate on a failure to warn claim where plaintiff failed to present evidence that a different warning would have resulted in a change in injured party's behavior).

Based on the foregoing, the Court finds the Plaintiffs' failure to warn claim cannot survive summary judgment. The claim is, therefore, DISMISSED.

Because Mr. Bradley's TPLA claim has failed, so must Mrs. Bradley's loss of consortium claim. "A crucial element of a plaintiff's claim for loss of consortium in Tennessee is that the defendant in question must be proven liable for the injuries to the spouse giving rise to the loss of consortium claim." *Powers v. Wallen*, No. 3:12-CV-96, 2014 WL 1491213, at *16 (E.D. Tenn. Apr. 15, 2014).

Finally, the Court must address the Plaintiffs' motion for sanctions. Sanctions are sought due to the late disclosure by the Defendants of the chemical composition of the straps and, specifically, whether they contained a UV additive. In Plaintiffs' second interrogatories, Defendants were

presented with the following:

> State whether the fabric supplied by Chengwai Weaving Factory to manufacture the subject straps is a single material or a mixture of different types of polymers and additives. If a mixture, describe those polymers and additives.

(D.E. 86-1 at 5.) The Bradleys contend that they made the same request previously, in June 2013, to no avail. In responses dated March 17, 2014, the Defendants answered thusly: "Chemical composition of PP (polypropylene thread: Polypropylene 97.5%[;] Color master batches polyethylene 1%[; and] Spinning oil 1.5%[.]" (*Id.*) This information, the Bradleys submit, would have been valuable in their depositions of Defendants' experts in January 2014, as well as the preparation of reports by their own experts.

In response, the Defendants argue that the Plaintiffs were aware early in this litigation that the straps were made from polypropylene. The Defendants also point out that Plaintiffs' counsel deposed a representative of Primal Vantage in the *Freeland* case on October 29, 2013 in which the following question was asked:

> All right. So, whatever -- the materials, as purchased, there's nothing done, as you understand it, in the Chinese manufacturing facility, or when those straps arrive in the U.S. to add any components, any compounds, any chemicals, any additives that would increase the environmental resistance or integrity of those straps?

(D.E. 90 at 7.) The representative answered, "Correct. Nothing done, yes, correct." (*Id.*) Plaintiffs aver that they did not file a motion to compel because they were under the impression from testimony of Primal Vantage's representative in this case that the information was unknown to the Defendant or did not exist.

The Court finds that, while what appears to be some gamesmanship on the part of Defendants' counsel is regrettable and certainly not condoned, sanctions are not appropriate under the circumstances of this case. First, Plaintiffs' counsel's strategic decision not to file a motion to

compel disclosure or discovery renders relief based on a failure to comply with Court orders under Rule 37 of the Federal Rules of Civil Procedure unavailable, because there is no discovery order with which Defendants failed to comply. *See* Fed. R. Civ. P. 37(b). Second, although the Court may impose sanctions under Fed. R. Civ. P. 16(f) and its inherent powers absent a motion to compel discovery, it chooses not to do so in light of the fact that any failure and/or delay in disclosing the chemical composition of the ratchet straps ultimately had no effect on the outcome of this case. Accordingly, the motion is DENIED.

<em>CONCLUSION</em>

In sum, the motions of the Defendants for summary judgment are GRANTED (D.E. 57-59), the motion of the Plaintiffs for partial summary judgment is DENIED (D.E. 55), the Defendants' motions to exclude the expert testimony of Messrs. Powell and Davison (D.E. 64-65) are GRANTED, the Defendants' motion to file a surreply is DENIED (D.E. 84), and the Plaintiffs' motion for sanctions is DENIED (D.E. 86).

IT IS SO ORDERED this 6th day of June 2014.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE